UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GLORIA D. FIELDS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 15 C 4581 |
| ) | |
| THE BOARD OF EDUCATION OF ) | Judge Rebecca R. Pallmeyer |
| THE CITY OF CHICAGO and ) | |
| CHAD P. WEIDEN, PRINCIPAL, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Gloria Fields was a teacher at Edgebrook Elementary School in Chicago from 2002 to 2016. In 2013, Defendant Chad Weiden became principal at Edgebrook. Weiden gave Plaintiff several negative reviews regarding her lesson plans and her performance in the classroom, as well as suggestions for improvement, which Plaintiff implemented sporadically. Beginning in 2014, Weiden put Plaintiff on several "performance improvement plans," and eventually sent her formal notices that she was in danger of being terminated. After these notices, Weiden and Plaintiff met with a mediator and Plaintiff was not disciplined. Plaintiff went on medical leave, and, after several months on leave, retired as a teacher. She now brings this lawsuit alleging that Defendants Weiden and the Chicago Board of Education discriminated against her based on her age and race, and retaliated against her for filing an employment discrimination claim with the EEOC and this instant lawsuit. Additionally, Plaintiff brings a claim of intentional infliction of emotional distress against Defendant Weiden. Defendants have moved for summary judgment. For the reasons stated below, the motion is granted.

## BACKGROUND

Plaintiff began working at Edgebrook Elementary School in 2002. (Dep. of Gloria Fields, Ex. B to Defs.' Local Rule 56.1 Statement of Material Facts [81-1 at p. 8] ("Fields Dep.") at 32:10–14.) By the time Defendant Weiden became principal of Edgebrook in 2013, Plaintiff had

been teaching seventh and eighth grade English/Language Arts for one year. (Defs.' Local Rule 56.1 Statement of Material Facts [81] ( "Defs.' SOF") at ¶¶ 6, 9.) During his first year as principal, Defendant Weiden began requiring teachers to submit weekly lessons plans to him—a requirement that not been imposed by Weiden's predecessors. (Decl. of Chad Weiden, Ex. A to Defs.' SOF [81-1 at p. 1] at ¶ 6; Defs.' SOF ¶ 11.)[1] Weiden and the assistant principal, Mary Clancy, later began giving feedback on the teachers' lesson plans, identifying strengths and making suggestions for improvement. (Defs.' SOF ¶¶ 7, 13.) The stated goal was to bring the instructor's lesson plans in line with educational standards. (*Id.* at ¶ 14.)[2] Much of the feedback provided to Plaintiff described her lesson plans as overly long and scripted from textbooks. (*Id.* at ¶ 15.)

Another portion of Weiden's duties was to conduct weekly "pop-in" observations of teachers in their classrooms. (*Id.* at ¶ 17.) During his observations of Plaintiff's classroom, Weiden observed that Plaintiff's instruction was disconnected from her lesson plans; that the students were unengaged, unchallenged, and copying directly from their textbooks; and that they did not seem to understand the directions, expectations, or purpose of the lessons. (*Id.* at ¶¶ 18–21.) Weiden also received complaints from parents and students concerned about Plaintiff's ineffective communications regarding assignments and classroom issues. (*Id.* at ¶ 28.) Weiden attempted to work with Plaintiff to improve her lessons, but Plaintiff only

---

[1] Plaintiff claims that this fact is inconsistent with the Defendants' statement that Weiden did not provide feedback on lesson plans until the 2014–15 school year (Pl.'s Resp. to Defs.' SOF [92] at ¶ 11), but that is incorrect: it is not inconsistent that Weiden required submission of lesson plans his first year, and then began providing feedback on them in his second year.

[2] Plaintiff disagrees that the purpose of the feedback was to help her improve (Pl.'s Resp. to Defs.' SOF ¶ 14) and similarly disagrees with other of Defendants' proposed material facts as supported only by Weiden's testimony. But she provides no citation to the record contradicting these facts. As such, Defendant's fact is deemed admitted. *See Montano v. City of Chi.*, 535 F.3d 558, 569 (7th Cir. 2008) ("mere disagreement with the movant's asserted facts is inadequate [to defeat summary judgment] if made without reference to specific supporting material") (quoting *Smith v. Lamz,* 321 F.3d 680, 683 (7th Cir. 2003)) (alteration in original).

sporadically implemented Weiden's suggestions. (*Id.* at ¶¶ 22–23.) Additionally, Weiden assigned the resident principal,[3] Tammy Vance, to be Plaintiff's instructional coach and to assist her with lesson planning and student engagement. (*Id.* at ¶ 8, 25.) For her part, Plaintiff believed Vance to be unqualified and refused to work with her. (Fields Dep. 219:19–220:3.) When Weiden offered to assist and support her himself, Plaintiff refused him as well. (*Id.* at 220:4–8.)

I.  **Plaintiff's REACH Evaluation**

Beginning in the in the 2013-14 school year, the Chicago Public Schools started using the "Recognizing Educators Advancing Chicago's Students" ("REACH") performance evaluation system. (Defs.' SOF ¶ 32.) Under the REACH system, teachers are observed at least four times over two years, presumably by school administrators (Weiden, Clancy, and Vance all observed Plaintiff) who assess their their professionalism, their planning, their establishment of a safe classroom environment, and execution of instruction. (*Id.* at ¶ 34, 36–37.) These assessments are given quantitative ratings, which the REACH formula combines with other data, such as student performance, to compute a total score. (*Id.*) These scores then translate into one of four ratings: "unsatisfactory," "developing," "proficient," and "excellent." (Evaluation Summary Report, Ex. 1 to Suppl. Decl. of Chad Weiden, Ex. B to Defs.' Local Rule 56.1 Resp. to Pl.'s Statement of Additional Facts [90-1 at p. 8].) Plaintiff's rating for 2013–2015 was "developing," although her score was close to the cutoff for "proficient."[4] (*Id.*)

---

[3] The parties do not explain what the role of "resident principal" entails.

[4] Plaintiff describes her REACH evaluation in an affidavit, detailing her "proficient" and "distinguished" ratings in several categories. (Aff. of Gloria Fields, Ex. 1 to Pl.'s Resp. to Defs.' Mot. for Summ. J. [91-1] at ¶¶ 15–18.) She claims that at one point her overall rating was "proficient," but that is not supported by the overall rating shown in the REACH evaluation in the record, which was "developing." (*Id.*; Evaluation Summary Report, Ex. 1 to Suppl. Decl. of Chad Weiden, Ex. B to Defs.' Local Rule 56.1 Resp. to Pl.'s Statement of Additional Facts [90-1 at p. 8].)

## II.     Performance Improvement Plans ("PIPs")

In February 2014, Edgebrook Elementary hosted an informational meeting for parents of rising seventh graders. (Defs.' SOF ¶ 39.) Plaintiff claims that this meeting was not mandatory, but admits that Weiden and the administration "would have wanted" her and the other seventh grade teachers to attend. (Fields Dep. 77:1–16.) Despite being at school that day, Plaintiff did not attend the meeting. (Defs.' SOF ¶ 40.) Plaintiff did not notify Weiden or other administrators that she would not attend. (*Id.* at ¶ 41.) The next day, Weiden and Clancy met with Plaintiff. (*Id.* at ¶¶ 42–43.) After ensuring Plaintiff was feeling healthy, Weiden told her that he was disappointed that she provided no notice of her absence. (*Id.* at ¶ 44.) Weiden also informed Plaintiff that many parents had expressed concern about her absence. (*Id.* at ¶ 45.)

Plaintiff also failed to attend a mandatory professional development session in November 2014, again giving no advance notice of her absence. (*Id.* at ¶¶ 46–47.) In spring 2015, Plaintiff was given the task of completing and submitting field trip request forms for the eighth-grade graduation. (*Id.* at ¶ 48.) She did not submit these forms by the required deadline, and requested that another staff member complete them. (*Id.* at ¶ 49.) Plaintiff ultimately submitted the forms after numerous e-mails and requests reminding her (the parties do not say from whom). (*Id.* at ¶ 50.) In September 2015, Plaintiff failed to attend a "principal-directed preparation period" (the court does not know what such an event entails). (*Id.* at ¶ 52.)

Between March 6, 2014, and November 22, 2015, Weiden sent Plaintiff five "pre-meeting notices," which an administrator sends to a teacher to schedule a meeting about his or her conduct. (Aff. of Gloria Fields, Ex. 1 to Pl.'s Resp. to Defs.' Mot. for Summ. J. [91-1] ("Fields Aff.") at ¶¶ 24–26.) Based on the above performance issues, Weiden drafted and issued three performance improvement plans ("PIPs"), on dates not set forth in the record. (Defs.' SOF ¶ 58–60.) The purpose of PIPs is to identify a teacher's behavioral issues and give him or her

4

time to correct the identified behavior. (*Id.* at ¶ 54–55.) CPS employees did not face punitive discipline until three PIPs fail to correct the same behavioral issue. (*Id.*)

After Plaintiff received her third PIP for insubordination, the Chicago Teachers Union requested a "mediation/arbitration" hearing on her behalf. The hearing was conducted on January 13, 2016. (*Id.* at ¶ 60–61; Fields Aff. ¶ 28.) Plaintiff contends that the Defendant Board of Education wanted Plaintiff to "voluntar[ily] separat[e]" from CPS as part of its opening position. (Fields Aff. ¶ 28.) The parties dispute what occurred at the meeting, specifically, what the mediator said about the merits of the "charges" against Plaintiff. Plaintiff claims that "only one of the five charges against her was warranted"; Defendants deny this, but do not offer their version of events. (Defs.' Local Rule 56.1 Resp. to Pl.'s Statement of Additional Facts [99] at ¶ 14.) At the meeting, the mediator asked if Weiden would object to Plaintiff's not receiving any disciplinary action. (Defs.' SOF at ¶ 62.) Weiden had no objections, and Plaintiff was not disciplined. (*Id.* at ¶¶ 63–64.) Throughout Weiden's time at Edgebrook, the only discipline Plaintiff claims to have received from Weiden were the five pre-meeting notices. (*See* Pl.'s Resp. to Defs.' SOF ¶ 29.)

After the mediation, Plaintiff went on a leave of absence pursuant to the Family Medical Leave Act. (Fields Aff. ¶ 32.) Plaintiff claims that the pre-meeting notices and mediation "greatly traumatized" her, so she sought treatment from a therapist and psychologist. (*Id.* at ¶¶ 31–32.) Plaintiff claims she was diagnosed with "situational anxiety" as a result of Defendant Weiden's conduct, and her therapist recommended that she not return to work with Weiden. (*Id.* at ¶ 33.) Plaintiff retired from her position at Edgebrook Elementary School in May 2016. (Defs.' SOF ¶ 31.)

Plaintiff submitted a claim of discrimination to the EEOC in April 2015—well before the mediation hearing, her leave of absence, and her retirement. (Fields Aff. ¶ 19.) The record does not reflect what became of this charge. Plaintiff filed this lawsuit on May 26, 2015, and

5

alleges age and race discrimination[5] and retaliation by both Defendants, and intentional infliction of emotional distress by Weiden.  Defendants have now moved for summary judgment.  For the reasons stated below, the motion is granted.

**DISCUSSION**

Summary judgment is proper when the moving party has demonstrated that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A factual dispute is genuine if the evidence, when viewed in the light most favorable to the nonmoving party, "is such that a reasonable jury could return a verdict for the nonmoving party."  *Sweatt v. Union Pac. R. Co.*, 796 F.3d 701, 707 (7th Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

**I.      Age and Race Discrimination Claims**

Evidence in discrimination claims is no longer analyzed as either "direct" or "indirect." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765-766 (7th Cir. 2016).  Instead, the court's basic inquiry on summary judgment is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the [plaintiff's] discharge or other adverse employment action."  *Ferrill v. Oak Creek-Franklin Jnt. Sch. Dist.*, 860 F.3d 494, 499 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765).

A prerequisite for a claim of race or age discrimination is an adverse employment action. An adverse employment action is one that results in a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Chaudhry v. Nucor Steel-Ind.*, 546 F.3d 832, 838 (7th Cir. 2008) (quoting *Bell v. E.P.A.*, 232 F.3d 546, 555 (7th Cir. 2000)).  Plaintiff argues that her voluntary retirement was a constructive discharge, which "constitutes an

---

[5]    Plaintiff is African-American and was sixty-one years old when the motion for summary judgment was filed; the court presumes she was approximately fifty-nine when the litigation commenced and fifty-seven when Weiden became principal.  (Fields Aff. ¶ 2.)

6

adverse employment action." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). The Seventh Circuit has recognized two forms of constructive discharge, both of which require the Plaintiff to show that she was forced to resign because her working conditions, when viewed by a reasonable employee, had become unbearable. *Id.*

The first form of constructive discharge occurs when the employee "resigns due to alleged discriminatory harassment." *Id.* The plaintiff's working conditions must be "even more egregious than that required for a hostile work environment claim," such as when it poses a threat to the employee's safety. *Id.*; *see Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1191, 1198–99 (7th Cir. 1992) (affirming a finding of constructive discharge where supervisor brandished a firearm and held it to plaintiff's head). Plaintiff does not meet this high standard; she has not alleged any actions that rise to this level of harassment. There is no indication that Plaintiff was physically threatened by Weiden or any other administrator. A mediation hearing and pre-meeting notices would not rise to the level of a hostile work environment claim, so they cannot be the basis for Plaintiff's constructive discharge claim.

The second form of constructive discharge occurs "[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *Chapin*, 621 F.3d at 679 (quoting *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002). Plaintiff also fails to demonstrate this form of constructive discharge. After the "mediation/arbitration" meeting with the Chicago Teachers Union, Weiden did not object to the suggestion that no disciplinary action be taken against Plaintiff. There is no evidence that Weiden knew Plaintiff was so upset that she would not return to her job; the only actions Weiden had taken—the pre-meeting notices, the meetings, the PIPs, and the mediation—resulted in no discipline. Thus, at the time Plaintiff resigned, Weiden was not acting in a manner that would reasonably lead Plaintiff to expect to be fired. In fact, the evidence suggests the opposite, given that Plaintiff claims to have been vindicated on four of the five charges

7

presented at the mediation. (Fields Aff. ¶¶ 29–31.) Put another way, there is no indication that "the handwriting was on the wall" and she quit "just ahead of the fall of the axe." *Chapin*, 621 F.3d at 680.

Plaintiff's constructive discharge claim fails for an additional reason: she has not demonstrated that her working conditions had become intolerable—a requirement for both types of constructive discharge. Receipt of pre-meeting notices and PIPs, despite suggesting the possibility of further discipline, are not sufficient by themselves to demonstrate constructive discharge. *Id.* at 679 ("[A] working condition does not become intolerable or unbearable merely because a prospect of discharge lurks in the background.") (citing *Cigan v. Chippewa Falls Sch. Dist.*, 388 F.3d 331, 333 (7th Cir. 2004)) (internal quotation marks omitted). Even if the working environment was in fact intolerable to Plaintiff herself, she has not demonstrated that they would be intolerable to a reasonable employee.

Finally, Plaintiff has presented no evidence establishing a genuine dispute over her allegedly discriminatory treatment, or of being singled out based on her race or age. At her deposition, Plaintiff described numerous coworkers—including white individuals and individuals under 40—whom she believed had fallen under similar scrutiny from Weiden. (Fields Dep. 178:18–198:6.) She also listed several coworkers—including individuals of varying races and individuals approximately her same age—whom she believed had been treated more favorably than she had been. (Fields Dep. 153:6–165:15, 167:10-178:10.) In short, there is little to suggest that considerations beyond individuals' job performance entered into the Defendants' calculations, and even less to suggest that Weiden's nondiscriminatory explanations for his behavior was "mere pretext." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798 (1973).

Because Plaintiff was not constructively discharged, she did not suffer an adverse employment action. Summary judgment is granted on the race and age discrimination claims.

**II.     Retaliation**

To survive summary judgment on a Title VII retaliation claims, Plaintiff must submit evidence that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal link exists between the two. *Hnin v. TOA (USA), LLC*, 751 F.3d 499, 508 (7th Cir. 2014). Plaintiff engaged in statutorily protected activity when she filed a claim of employment discrimination with the EEOC in April 2015 and when she filed the instant suit in May 2015. But Plaintiff has failed to prove that she suffered a materially adverse employment action, even under the more flexible test available for a claim of retaliation.

For retaliation purposes, an adverse action must be "serious enough to dissuade a reasonable employee from engaging in protected activity." *Poullard v. McDonald*, 829 F.3d 844, 858 (7th Cir. 2016). Plaintiff claims she suffered the adverse actions of constructive discharge, as well as receiving the pre-meeting notices threatening potential discipline and the fact that the Defendants tried to terminate Plaintiff at the mediation. As discussed above, Plaintiff was not constructively discharged, so this cannot qualify as an adverse action for retaliation. Furthermore, Plaintiff presents no evidence that Defendants actively tried to have her terminated at the mediation; she avers only that she "fac[ed] the possibility of an involuntary termination." (Fields Aff. ¶ 28.) Indeed, Weiden agreed with the mediator's suggestion that Plaintiff not be disciplined, belying this argument. Both the threat of termination and the pre-meeting notices carried the threat of discipline and termination, but the possibility of disciplinary action is not a materially adverse employment action. *See Poullard*, 829 F.3d at 856 ("While we do not doubt that the possibility of discipline can be stressful, we have previously held that this kind of threat is not enough to support a claim for retaliation."); *Cole v. Illinois*, 562 F.3d 812, 814, 816 (7th Cir. 2009) (placing plaintiff on an improvement plan and telling her she would be fired if she did not "sign" it was not an adverse action); *Elue v. City of Chicago*, No. 16 CV

09564, 2017 WL 2653082, at *7 (N.D. Ill. June 20, 2017) ("Oral and written reprimands and placement on performance improvement plans also do not constitute adverse employment actions when they are not tied to changes in the terms and conditions of employment."). Thus, Plaintiff's retaliation claim fails because she has not shown any adverse employment action.

### III.  Intentional Infliction of Emotional Distress

To succeed on a claim of intentional infliction of emotional distress, Plaintiff must prove: "(1) extreme and outrageous conduct; (2) intent to cause or a reckless disregard of the probability of causing emotional distress; (3) severe or extreme emotional distress; and (4) actual or proximate causation of emotional distress by the outrageous conduct." *Hunt-Golliday v. Metro. Water Recl. Dist.*, 104 F.3d 1004, 1016 (7th Cir. 1997).

Weiden argues first that Plaintiff's IIED claim is preempted by the Illinois Workers' Compensation Act, 820 ILCS 305/1 *et seq.* Although the IWCA provides the exclusive remedy for "accidental injuries," in Illinois "an injury that was intentionally inflicted upon an employee by another employee nevertheless is considered 'accidental' on behalf of the employer if it was unexpected and unforeseen by the injured party, unless the employer expressly authorized the co-employee to commit the tort." *Hunt-Golliday*, 104 F.3d at 1016. Here, however, Plaintiff has brought her IIED claim against Weiden, not against her employer—the Board of Education. Defendants have cited no cases concerning the applicability of the IWCA to a tort claim against another employee of the same employer. The court therefore does not address this issue and turns to the merits of the claim.

Plaintiff has failed to provide sufficient evidence in support of the first element: extreme and outrageous conduct. When a case involves an employer and employee, extreme and outrageous conduct can be found when the employer "clearly abuses the power he holds over an employee in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment." *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 747 (7th Cir.

2008). "Illinois courts have recognized that personality conflicts and questioning of job performance are 'unavoidable aspects of employment' and that 'frequently, they produce concern and distress.'" *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 567 (7th Cir. 1997) (quoting *Heying v. Simonaitis*, 126 Ill. App. 3d 157, 81 Ill. Dec. 335, 342, 466 N.E.2d 1137, 1144 (1st Dist. 1984)).

While Weiden did criticize Plaintiff's job performance, he also offered her tools which she could use to improve—or, from her perspective, ways to satisfy Weiden's criticisms. The fact that Weiden set standards that Plaintiff disagreed with is not extreme or outrageous. In fact, even if the issuance of pre-meeting notices were unwarranted, they were not extreme or outrageous and issuing them was not an abuse of Weiden's power. Furthermore, during the mediation, Weiden had no objections to the mediator's suggestion that Plaintiff not be disciplined.

Plaintiff's claim also fails on the second element requiring intent or reckless disregard. As explained above, though Plaintiff herself may have suffered distress due to the potential for termination, such situations are common in the workplace. Plaintiff offers no basis for a conclusion that Weiden knew Plaintiff would suffer extreme distress at the mere threat of termination, particularly when Weiden had offered options to help improve her performance and given that Plaitiff was ultimately not disciplined. For these reasons, summary judgment is granted on Plaintiff's IIED claim.

**CONCLUSION**

Defendants' motion for summary judgment [79] is granted on all three counts for the reasons stated above.

ENTER:

*[signature]*

Dated: September 15, 2017      _____
                                       REBECCA R. PALLMEYER
                                       United States District Judge